LJW/DEH: USAO # 2016R00169

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 JUN 22 PM 4: 58

CLERK'S OFFICE
AT BALTIMORE

BY ___ K ___ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WAYNE EARL JENKINS,<br><br>DANIEL THOMAS HERSL,<br><br>and<br><br>MARCUS ROOSEVELT TAYLOR,<br><br>Defendants. | **UNDER SEAL**<br><br>**Criminal No. JKB 17-106**<br><br>**(RICO Conspiracy, 18 U.S.C. § 1962(d); RICO, 18 U.S.C. § 1962(c); Hobbs Act Robbery, 18 U.S.C. § 1951; Possession of a Firearm in Furtherance of a Crime of Violence, 18 U.S.C. § 924(c); Aiding and Abetting, 18 U.S.C. § 2; Criminal Forfeiture, 21 U.S.C. § 853)** |

## SUPERSEDING INDICTMENT

### COUNT ONE
### (RICO Conspiracy)

The Grand Jury for the District of Maryland charges that at all times relevant to this Superseding Indictment:

### THE ENTERPRISE

1.      The Baltimore Police Department ("BPD") was an agency of the State of Maryland whose jurisdiction covers Maryland's largest city, Baltimore, with a population of more than 621,000. The BPD was the eighth largest municipal police force in the United States staffed by nearly 3,100 civilians and sworn personnel.

2.      The BPD constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4). The BPD engaged in, and its activities affected, interstate commerce.

3.      The Special Enforcement Section (SES) of the BPD focused on investigating violent offenders, gangs, and gun crimes across Baltimore.

4.      The Gun Trace Task Force ("GTTF") was a specialized unit within the Operational Investigation Division of the BPD.  The primary mission of the GTTF was the tracking and tracing of recovered firearms in order to identify and suppress the possession, purchasing, and trafficking of illegal firearms within Baltimore City, and to assist with the investigation and prosecution of firearms-related offenses.

5.      Sworn members of the BPD must abide by the Law Enforcement Officer's Code of Ethics, which provides, in pertinent part:

> As a Law Enforcement Officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation; the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice. I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed both in my personal and official life, I will be exemplary in obeying the law and the regulations of my department ... I recognize the badge of my office as a symbol of public faith and I accept it as a public trust to be held so long as I am true to the ethics of police service. I will never engage in acts of corruption or bribery, nor will I condone such acts by other police officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice ... I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession . . . law enforcement.

## PURPOSE OF THE ENTERPRISE

6.      The purpose of the BPD was to protect and preserve life, protect property, understand and serve the needs of the Baltimore City's neighborhoods, and to improve the quality of life in Baltimore City.

## THE DEFENDANTS

7.      Sergeant WAYNE EARL JENKINS joined the BPD on February 20, 2003.  He became the officer in charge of an SES unit on October 14, 2013 and became the officer in charge of the GTTF on or about June 13, 2016.  Prior to becoming a Sergeant, JENKINS was a Detective beginning on November 30, 2012 and continuing until he became a Sergeant.

8.      Detective DANIEL THOMAS HERSL joined the BPD on September 7, 1999, and was assigned to the GTTF not later than April 28, 2016.

9.      Detective MARCUS ROOSEVELT TAYLOR joined the BPD on May 18, 2009.  He joined the SES unit led by JENKINS on October 5, 2015 and was assigned to the GTTF, with JENKINS, on or about June 13, 2016.

10.      In Fiscal Year 2016 (July 1, 2015 through June 30, 2016), the defendants earned the following in salary and overtime from their employment with the BPD:

| Defendant | Annual Salary | Overtime | Gross Pay |
|-----------|---------------|----------|-----------|
| JENKINS | $85,406 | $83,345.15 | $168,751.15 |
| HERSL | $77,591 | $66,602.98 | $144,193.98 |
| TAYLOR | $66,784 | $56,246.35 | $123,030.35 |

## PURPOSES OF THE DEFENDANTS

11.      The purposes of the defendants included violating the legitimate purposes of the BPD in order to enrich themselves through illegal conduct, including extortion, robbery and time and attendance fraud.

## THE RACKETEERING CONSPIRACY

12.     Beginning at a date unknown to the Grand Jury, but at least by in or about 2015, through on or about the date of this Superseding Indictment, in the District of Maryland and elsewhere, the defendants,

**WAYNE EARL JENKINS,**
**DANIEL THOMAS HERSL**
and
**MARCUS ROOSEVELT TAYLOR**

being persons employed by and associated with the BPD, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, together with M.G., E.H., J.R. and M.W. and other persons known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate and agree to violate Section 1962(c) of Title 18, United States Code, that is, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, consisting of multiple acts indictable under:

a. 18 U.S.C. § 1343 (wire fraud)

and multiple acts involving:

b.  Robbery, and Attempted Robbery, chargeable under MD. CODE ANN., Crim. L. § 3-402 and Conspiracy, chargeable under MD. CODE ANN., Crim. L.§ 1-203.

c.  Extortion and Attempted Extortion by State or local Government Officer or Employee chargeable under MD. CODE ANN., Crim. L. § 3-702 and Conspiracy, chargeable under MD. CODE ANN., Crim. L.§ 1-203;

d.  21 U.S.C. § 846 (conspiracy to distribute a controlled substance); and

e.  21 U.S.C. § 841 (distribution and possession with intent to distribute a controlled substance).

4

## MEANS AND METHODS OF THE CONSPIRACY

13.     Among the means and methods by which the defendants and others pursued their

illegal purposes were the following:

a. Beginning in 2015 when JENKINS was the officer-in-charge (OIC) of an SES

unit and continuing through when JENKINS became the OIC of the GTTF in

2016, JENKINS stole drugs from individuals who were temporarily detained and

in some, but not all cases, arrested.  In cases where a detainee was not arrested,

JENKINS would tell them he was "cutting them a break," or words to that effect,

and that he was not going to charge them but that he was seizing their drugs and

would submit them to BPD.  JENKINS would not then submit the drugs to BPD.

i. Initially, JENKINS lied to E.H. and M.W. and told them he was

submitting seized drugs to the evidence control unit, when, in truth and

fact, he was not.

ii. In order to conceal his conduct, JENKINS prepared false incident reports

that did not disclose that drugs were seized from detainees and arrestees

and, in some instances, did not prepare any documentation at all.

iii. At various times, JENKINS approached members of his SES unit and the

GTTF unit, and asked them if they had family members or associates in

the community who could sell drugs for him.  M.W. and E.H. refused to

do so.  J.R. agreed to do so and took drugs from JENKINS and sold them

through an associate and shared the proceeds with JENKINS.

iv. JENKINS also used other associates of his to sell drugs he stole from

detainees and arrestees.

b.  Beginning in 2015 when JENKINS was the OIC of an SES unit and continuing

through when JENKINS became the OIC of the GTTF in 2016, JENKINS stole

money from detainees and arrestees. When conducting law enforcement activities

with Detectives TAYLOR, E.H. and M.W., who were members of the SES unit

JENKINS led and later went with him to the GTTF, JENKINS would take

custody of money recovered from detainees and arrestees and would keep a

portion of it or all of it for himself.  On occasions when large amounts of cash

were seized from arrestees and their homes, JENKINS would share the proceeds

with TAYLOR, E.H. and M.W.  Later, when JENKINS became the OIC of the

GTTF he also engaged in robberies with HERSL and with M.G. and J.R. and

shared the proceeds of those robberies with them.

c.  HERSL robbed arrestees and detainees, and shared the proceeds with others

known and unknown to the grand jury.

d.  JENKINS told detainees and arrestees that he was a federal agent, including the

United States Attorney, a United States Marshal and a Drug Enforcement Agency

(DEA) agent in order to conceal his true identity when he robbed them.

e.  In order to conceal their criminal conduct, JENKINS, HERSL, TAYLOR and

other members of the conspiracy authored false incident and arrest reports or

prepared no paperwork whatsoever documenting their encounters with detainees

and arrestees.  JENKINS, HERSL, TAYLOR and other members of the

conspiracy created false charging documents and made false reports of property

seized from arrestees to conceal the fact that the defendants stole money, property

and narcotics from individuals.

f.  In 2016, after he became OIC of the GTTF, JENKINS learned, at various times, from sources within the BPD and from an Assistant State's Attorney, that he and members of the GTFF were under investigation by federal law enforcement. JENKINS shared that information with other members of the GTTF.  TAYLOR also learned from a source within the BPD Internal Affairs Division that the GTTF was under investigation and TAYLOR conveyed this information to at least one other member of the GTTF.  Despite becoming aware of this information, JENKINS, HERSL, and TAYLOR continued to engage in criminal conduct.

g.  JENKINS, HERSL, TAYLOR and the other members of the conspiracy defrauded the BPD and the State of Maryland by submitting false and fraudulent time and attendance records in order to obtain salary and overtime payments for times when the defendants did not work.

h.  When JENKINS, HERSL and TAYLOR were detained in the Howard County Detention Center, JENKINS directed the defendants to "keep their mouths shut" and "stick to the story," or words to that effect, specifically referring to videos that he and the other Defendants had created to obstruct justice.  TAYLOR and HERSL agreed to do so.  These videos contained false reenactments of events the Defendants participated in and statements from detainees and arrestees that were elicited through fraudulent representations from the Defendants and were designed to deceive law enforcement if the Defendants' criminal conduct were ever questioned.

## OVERT ACTS

14.     In furtherance of the conspiracy, the defendants committed the following overt acts in the District of Maryland and elsewhere:

### Spring 2015, Robbery / Extortion at Belvedere Towers

15.     In or about spring 2015, Sergeant JENKINS and Detectives TAYLOR and M.W., while acting in their capacity as police officers, interrupted the sale of a large amount of marijuana in the parking lot of Belvedere Towers apartments in Baltimore City.

16.     JENKINS took a bag containing 20 to 25 pounds of marijuana from the seller and a second bag containing $20,000 to $25,000 from the buyer.  The seller was charging the buyer approximately $1,000 per pound for the marijuana. JENKINS falsely told the buyer and seller that he was a DEA agent and that he would let them go but that he might exercise his discretion to charge them in the future.

17.     JENKINS then directed TAYLOR and M.W. to a wooded area near the intersection of Northern Parkway and Liberty Road. JENKINS told TAYLOR and M.W. to leave their phones in the car, in order to avoid detection from law enforcement, and to follow him into the woods. Once out-of-sight of the road, JENKINS opened the bag of money and gave TAYLOR and M.W. approximately $5,000 each. JENKINS kept the rest of the money. JENKINS also kept the 20 to 25 pounds of marijuana taken from the drug sale. JENKINS never submitted these drugs to BPD.

18.     After dividing up the money taken from the drug sale, JENKINS drove TAYLOR and M.W. to a strip club in Baltimore County. At the strip club, JENKINS robbed a stripper. JENKINS fled the strip club with TAYLOR and M.W. after robbing the stripper.

**February 17, 2016, Robbery / Extortion of R.B.**

19.     On or about February 17, 2016, Sergeant JENKINS and Detectives TAYLOR and M.W., acting in their capacity as police officers, arrested R.B.

20.     At the time of the arrest, JENKINS, TAYLOR and M.W. took at least $400 from R.B. while he was handcuffed and seated in the back of a police vehicle.

21.     To conceal the illegal conduct, on or about February 17, 2016, M.W. submitted an incident report and JENKINS approved the incident report, which was filed with the BPD supporting the arrest of R.B.  Above their signatures, JENKINS and M.W. certified that, "I affirm and declare that the statements above are true to the best of my knowledge."  JENKINS approved the report knowing that it falsely failed to list any money recovered from R.B., when in fact, JENKINS, TAYLOR and M.W. had stolen at least $400 from R.B.

22.     JENKINS, TAYLOR, and M.W. did not submit the money they stole from R.B. to BPD.

**March 9, 2016, Robbery / Extortion of M.MC.**

23.     On or about March 9, 2016, Sergeant JENKINS and Detectives TAYLOR, E.H., and M.W., acting in their capacity as police officers, arrested M.MC.

24.     At the time of the arrest, JENKINS stole at least $1000 from M.MC.

25.     To conceal his illegal conduct, on or about March 9, 2016, JENKINS approved an incident report authored by M.W. that was filed with the BPD supporting the arrest of M.MC. Above his signature, JENKINS certified that, "I affirm and declare that the statements above are true to the best of my knowledge."  JENKINS approved the report knowing that it falsely stated that the only property seized from M.MC. was, "a shoe bag, a t shirt, a handgun with ammunition, a plastic bag, and four small baggies of marijuana."

26.     JENKINS did not submit the $1000 he stole from M.MC. to BPD.

**March 22, 2016, Robbery / Extortion of O.S.**

27.     On or about March 22, 2016, Sergeant JENKINS and Detectives TAYLOR, E.H., and M.W., acting in their capacity as police officers, conducted a traffic stop and arrested O.S. The defendants seized suspected narcotics and $21,500 from O.S.  JENKINS only submitted $15,000 of the $21,500 that was taken from O.S. and kept the rest for himself.  At the time of the arrest, the defendants also took O.S.'s house key and looked at his driver's license which identified the location of O.S.'s residence.

28.     To conceal his illegal conduct, on or about March 22, 2016, JENKINS approved an incident report, authored by E.H., which falsely stated that only $15,000 had been seized from O.S., when in fact, $21,500 had been seized from O.S.  Above his signature, JENKINS certified that, "I affirm and declare that the statements above are true to the best of my knowledge." JENKINS did not submit the $6,500 he stole from O.S. to the BPD.

29.     Following the arrest of O.S., JENKINS, TAYLOR, E.H., and M.W. entered O.S.'s residence.  JENKINS, TAYLOR, E.H. and M.W. stole money, including approximately $200,000 from a safe they opened and from two bags they seized, and property, including a Breitling men's wristwatch valued at $4,000 from the location.

30.     After JENKINS had emptied the safe he put $100,000 back into it and had the other members of the GTTF create a video, on TAYLOR's cellular telephone, that purported to show them opening the safe and finding the money.

31.     After the search, JENKINS, TAYLOR, E.H. and M.W. went to TAYLOR's house.  In TAYLOR's basement, JENKINS gave TAYLOR, E.H and M.W., at least $20,000 each from the money that had been stolen from O.S.  JENKINS kept the rest of the money for himself.

32.     To conceal their illegal conduct, JENKINS, TAYLOR, E.H. and M.W. did not report to BPD the more than $200,000 they seized from O.S.

### June 2016, Robbery and Subsequent Sale of Marijuana and a Firearm

33.     In or about June 2016, JENKINS, M.G., and J.R., acting in their capacity as police officers, conducted a car stop near the intersection of North Forest Park Avenue and Dickey Hill Road. Following the car stop, JENKINS, M.G., and J.R. went to the driver's residence, without a warrant, and seized a 9 mm handgun and a pound of marijuana. JENKINS directed J.R. to sell the handgun and the marijuana in order to pay off a drug debt J.R. owed JENKINS.

34.     M.G. arranged for an associate of his, who was a drug dealer, to buy the handgun and the marijuana. J.R. sold the handgun and marijuana to the drug dealer.

### June 24, 2016, Robbery / Extortion of M.M.

35.     On or about June 24, 2016, Sergeant JENKINS and Detectives E.H. and M.W., acting in their capacity as police officers, and with the assistance of a special weapons and tactics (SWAT) team entered a residence where M.M. was staying.

36.     When SWAT left the residence, JENKINS, M.W. and E.H. searched it.

37.     In the course of that search, JENKINS and E.H. stole cash from M.M. that they found in his residence.

### July 8, 2016, Robbery / Extortion of R.H. and N.H.

38.     On July 8, 2016, J.R. submitted an affidavit, under oath, to a Maryland State Circuit Court Judge, asking for authorization to search R.H. and N.H.'s home. The affidavit falsely stated that "[o]n July 5, 2016 Sgt. Jenkins, Det. [J.R.], and Det. [M.G.] conducted a full day of surveillance on [R.H.]. At approximately 0940 hrs. [R.H.] was observed exiting [his

residence] and entering into his [vehicle]. At 1030 hrs. [R.H.] arrived at [a location in Elkridge, Maryland] and stayed for approximately 1 hr. and 20 min." J.R. and M.G. were both at home in their residences when they claimed to be conducting surveillance of R.H.

39.     On July 8, 2016, at approximately 3:00 p.m., M.G. called J.C. During the call M.G. said, "Hey John [J.C.], we're pulling them over." J.C. replied, "All right. I'm waiting on you." J.R. said, "He [JENKINS] gave the order. We pull them over, bring them back to the academy. That's per, Sergeant Jenko [JENKINS]." J.C. then said, "All right. I got you. Hold on."

40.     J.R., M.G. and HERSL, all of whom were armed, then initiated a traffic stop of R.H. and N.H. and placed them in handcuffs. When J.R. took R.H. out of his car and searched him R.H. had approximately $3,400 on his person which J.R. stole. No drugs or weapons were recovered. R.H. and N.H. were not engaged in any criminal activity at the time they were detained.

41.     At approximately 3:11 p.m., M.G. called JENKINS. During the call, M.G. said, "Hey, what's up. We, ah, we headed down now [to a BPD off-site facility]. We go, um, got the package [R.H. is in custody]." JENKINS said, "Hold on one second, hey, hey, he's [R.H.] in the car with you?" M.G. replied, "Yeah, I got, I got the, um, male [R.H.] and they got the female [N.H.]." JENKINS said, "Okay, hey, uh, did you tell them anything at all?" M.G. replied, "No." JENKINS continued, "All right. Just tell them you gotta wait for the U.S. Attorney . . ." M.G., "Yeah, we gonna meet up with you and [unintelligible]." JENKINS said, "Okay, and when I get there, treat me like I'm the fucking U.S. Attorney. Like, hey Sir, how are you, we got our target in pocket. And then introduce me as the U.S. Attorney." M.G. said, "I got you."

42.     Following this call, JENKINS and J.R. interrogated R.H., in custody, at a BPD office. JENKINS told R.H. that he was a federal officer. JENKINS and J.R. asked R.H. if he had any money in his residence and R.H. told them that he did.

43.     JENKINS, HERSL, J.R. and M.G., all of whom were armed, then transported R.H.

and N.H. to their home in custody. Once at the house, JENKINS, HERSL, J.R. and M.G. located $70,000 in cash. Before officers from Maryland State Police (MSP) arrived to execute the search warrant, which was an out-of-jurisdiction warrant for the Defendants, JENKINS, HERSL, M.G. and J.R. stole $20,000 of the $70,000 located at the house. MSP recovered the remaining $50,000. No drugs or firearms or any other evidence of illegal conduct was recovered at R.H. and N.H.'s home and R.H. and N.H. were not charged with having committed any crime.

44.     Before leaving, JENKINS asked R.H. if he could identify someone that the GTTF could rob. JENKINS told him, "you take care of us, we take care of you," or words to that effect, and that if R.H. identified someone "big" for the GTTF to rob, R.H., could wind up with "ten kilos" of drugs in his backyard, that R.H. could then sell.

45.     After leaving R.H. and J.H.'s home, at approximately 7:38 p.m., M.G. called N.F. While the telephone was ringing, M.G. and J.R. discussed stealing money from R.H. and N.H.'s home. Specifically, M.G. told J.R., "I mean, if they're not gonna take the, it ain't that serious, just leave the fuckin' money." J.R. said, "Was I loud?" M.G. then laughed and said, "Shit man! Who gives a fuck. Give it to us. We'll take it. Shit, nigger. Yeah, ah, lemme, lemme, lemme git it. Give it back to me so I can take um, take one stack [$1000] out of there."

46.     J.R. subsequently counted the money that had been stolen from R.H. and N.H. and there was only $17,000.

47.     At approximately 10:35 p.m., M.G. called a female only identified as "Lee". In the beginning of the call, M.G. said, "Hey, listen, don't hang up. This is a two second conversation. Hold on." M.G., at approximately 10:36 p.m., then answered an incoming call from J.R. where the two discussed dividing up the money they had stolen from R.H.'s home. J.R. said, "Yo, real talk. I'm counting." M.G. interrupted him and said, "No, negative. I would never, c'mon, man." J.R. said, "Hey, alright again, yo. Ima count it [money] again, yo. I'm just lettin' you know."

13

M.G. talked over J.R. and said, "Hey, I would never [unintelligible]." J.R. said, "Hey bro, well I'm just lettin' you know, if it's a mistake [unintelligible]." M.G. said, "I don't make mistakes, countin' money." J.R. replied, "I'm lettin' you know." M.G. talked over him and then J.R. said then "I don't got no reason to lie, man. I'm just lettin' you know, yo. Ahright." M.G. then returned to the telephone call with Lee. Several minutes later and at the end of the conversation, M.G. said, "This nigger sayin' I'm three grand [$3,000] short, though. I'm just so mad about that." Lee responded, "Well, I don't know what you are talking about, but you called me, so I would think you outta be talking to me and not countin' money or whatever you're doing." After a pause, M.G. continued his conversation with Lee who complained that M.G. was not paying attention to her and said, "And then you fuckin' side tracked the whole conversation about, oh, why am I short three thousand dollars or three hundred dollars or whatever you said." M.G. then said, "That just, that just doesn't make sense [J.R.'s assertion that the money was short]." M.G. then said louder, "Hey, listen. Let me, let me, let me, hey, I'm a call you right back, babe. This is business. Let me handle this business real quick." M.G. then said, "I'm a call you right back. No, this is about finances. Let me call you back."

48.    While in R.H. and N.H.'s bedroom, HERSL had stolen $3,000 of the $20,000 that was originally discovered. M.G. confronted JENKINS about HERSL's theft of this money and JENKINS told him that "we're all a squad," or words to that effect, and told him not to confront HERSL about the missing money.

49.    Later that evening, at a bar in Baltimore, JENKINS, HERSL, M.G., and J.R. met and split up the remaining $17,000 they had stolen from R.H. and N.H.

50.    In order to conceal their illegal conduct, J.R. authored a false Incident Report for the arrest of R.H. and N.H. and the subsequent search of their home that was filed with the BPD. Above his signature, J.R. certified that, "I affirm and declare that the statements above are true to

the best of my knowledge." JENKINS approved the report. In that statement, J.R. and JENKINS

failed to disclose the fact that an additional $20,000 was seized from R.H. and N.H.'s home.

### Week of July 11 to 16, 2016, Time and Attendance Fraud

51.　　On July 15, 2016, at 9:31 a.m., M.G. called J.R. During the call J.R. told M.G. he

wasn't coming in to work because he had to "take care of shit at home." J.R. then said that

tomorrow he was going to "See what's up." M.G. then said, "easy money J. Easy money," and

"one hour can be eight hours," referring to the practice whereby JENKINS would sign overtime

slips claiming members of the GTTF had worked 8 hours of overtime when, in fact, they had

only worked one hour of overtime.

52.　　On July 15, 2016, at 11:01 a.m., M.G. told J.R. He told him, "Man, I'm

downtown. I called the nigger John [another member of the GTTF at that time], he's like, I'm

here. I'm like, what's goin' on. He like, I'm gonna look into some things. M.G. then told J.R.

that HERSL was not coming in. M.G. then told J.R., "I'm goin' home, goin' to sleep. Fuck that

shit yo," to which J.R. responded, "That's why I wasn't, yeah man. I work that overtime slip out

when Wayne [JENKINS] comes back, man."

53.　　On or about July 18, 2016, JENKINS submitted an Individual Overtime Report

for July 11, 2016 and falsely claimed to have worked 8 hours of overtime for "Proactive

Enforcement WD [Western District] / ED [Eastern District] / NED [Northeastern District]." He

falsely claimed to have worked, in total, from 6 p.m. on July 11, 2016 until 2 a.m., on July 12,

2016, when, in fact, JENKINS was in Myrtle Beach, South Carolina, with his family, on

vacation. JENKINS signed the report under the affirmation that, "We certify that the overtime

hours reported herein are authorized, were in fact worked, and are correct."

54.　　On or about July 18, 2016, JENKINS submitted an overtime report for July 12,

2016, and falsely claimed to have worked 8 hours of overtime for "OIS Crime Suppression WD

[Western District] / ED [Eastern District] / NED [Northeastern District]." He falsely claimed to have worked from 7:15 p.m. on July 12, 2016, to 3:15 a.m. on July 13, 2016, when, in fact, JENKINS was in Myrtle Beach, South Carolina, with his family, on vacation. JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

55.     On or about July 18, 2016, JENKINS submitted an overtime report for July 13, 2016, and falsely claimed to have worked 8 hours of overtime for "OIS Crime Suppression WD [Western District] / ED [Eastern District] / NED [Northeastern District]." He falsely claimed to have worked work from 6 p.m. on July 13, 2016, to 2 a.m. on July 14, 2016, when, in fact, JENKINS was in Myrtle Beach, South Carolina, with his family, on vacation. JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

56.     On or about July 18, 2016, JENKINS submitted an overtime report for July 15, 2016, and falsely claimed to have worked 8 hours of overtime for "OIS Crime Suppression WD [Western District] / ED [Eastern District] / NED [Northeastern District]." He falsely claimed to have worked from 8:39 a.m. to 4:39 p.m. on July 15, 2016, when, in fact, JENKINS was in Myrtle Beach, South Carolina, with his family, on vacation. JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

57.     On or about July 18, 2016, JENKINS submitted an overtime report for July 16, 2016, and falsely claimed to have worked 8 hours of overtime for "OIS Crime Suppression WD [Western District] / ED [Eastern District] / NED [Northeastern District]." He falsely claimed to have worked from 10 a.m. to 6 p.m. on July 16, 2016, when, in fact, JENKINS was in Myrtle Beach, South Carolina, with his family, on vacation. JENKINS signed the report under the

affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

### July 23 to 24, 2016, Time and Attendance Fraud

58.     On July 23, 2016, at 1:30 p.m., M.G. called M.Mo. The two discussed what they had done the night before. M.G. told M.Mo. that he was just getting up. He further told M.Mo. that he was "going in at 8 tonight."

59.     At 1:52 p.m., M.G. called his girlfriend, N.F. He told her he had to work tonight. She asked him "3 to 3, right?" He responded, "yeah, but they sayin' not to come in until 8." M.G. then told N.F. that he was, "tired of working."

60.     At 4:31 p.m., M.G. called J.R.. J.R. told M.G. that he could not come into work until 9 p.m. because he had to watch his children. J.R. also told M.G. that they are working "3 to 3" but aren't coming in until 8, so it will be 4 hours of overtime because they will "hit the street and get 2 guns." M.G. responded that he, "doesn't want to work."

61.     At 4:48 p.m., J.R. called M.G. He told M.G. that he had spoken with JENKINS and that JENKINS told him that it was, "gonna be just [M.G.] and JENKINS tonight." J.R. then told M.G. that JENKINS offered to "call [M.G.] back and push it back to 9" so that J.R. could also go out with them. J.R. then said that his wife may not come back until 10 p.m. and that he "[didn't] want to hold y'all up," so J.R. said "just y'all two," referring to M.G. and JENKINS.

62.     At 5:32 p.m., JENKINS called M.G. The two agreed to meet at BPD at 9:00 p.m. JENKINS said, "that way we have time to go out to eat with our families." JENKINS then said, "[h]ey. Hey. We don't get off till 3, but we aren't stayin' until fuckin' 3," to which M.G. replied, "[r]ight. I got you. I got you."

63.     At 5:35 p.m., J.R. called M.G. He told him that he had told his wife to stay in Pennsylvania so J.R. would not be working. J.R. said he thought it was "going to be like four guys tonight," to which M.G. responded, "[a]ll them niggers had plans."

64.     JENKINS submitted an Individual Overtime Report for July 23, 2016, and into July 24, 2016, where he falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. JENKINS falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 23, 2016. JENKINS returned to the vicinity of his home in Middle River, Maryland, for at least 3 hours in the evening of July 23, 2016, when he claimed to be working. JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

65.     HERSL submitted an Individual Overtime Report for July 23, 2016, where he falsely claimed to have worked a "Mandatory 12 Hour Shift" from 3 p.m. to 11 p.m. and then overtime from 11:16 p.m. on July 23, 2016, to 3:15 a.m. on July 24, 2016. JENKINS approved the Individual Overtime Report. HERSL was in Bel Air, Maryland, outside Baltimore City, and Canton in the evening on July 23, 2016. HERSL and JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

66.     TAYLOR submitted an Individual Overtime Report for July 23, 2016 and into July 24, 2016, where he falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. TAYLOR falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 24, 2016. JENKINS approved the Individual Overtime Report. TAYLOR was, in fact, in New York City on July 23 and July 24, 2016, on vacation. TAYLOR and JENKINS signed the report under the

affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

67.     JENKINS approved an Individual Overtime Report for M.G. for July 23, 2016, and into July 24, 2016, where M.G. falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. M.G. falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 24, 2016. M.G. was, in fact, in the vicinity of his home in Owings Mills, Maryland, outside of Baltimore City, until after 8 p.m. on July 23, 2016. M.G. and JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

68.     JENKINS approved an Individual Overtime Report that J.R. for July 23, 2016, and into July 24, 2016, where J.R. falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. J.R. falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 24, 2016. J.R. was, in fact, in the vicinity of his home for the entire day on July 23, 2016. J.R. and JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

69.     JENKINS approved an Individual Overtime Report that E.H. submitted for July 23, 2016, and into July 24, 2016, where E.H. falsely claimed to have worked a "Mandatory 12-hour shift," including 4 hours of overtime. E.H. falsely reported that he worked an assigned shift from 3 p.m. to 11 p.m. and then worked overtime from 11:15 p.m. on July 23, 2016, to 3:15 a.m., on July 24, 2016. E.H. was, in fact, in the vicinity of his home for the entire day on July 23, 2016. E.H. and JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

19

70.    JENKINS approved an Individual Overtime Report submitted by M.W. for July 23, 2016, where he falsely claimed to have worked a "Mandatory 12 Hour Shift" from 3 p.m. to 11 p.m. and then overtime from 11:16 p.m. to 3:15 a.m. on July 23, 2016. M.W. was, in fact, in the vicinity of his home in Middle River, Maryland, outside of Baltimore City, for the entire day on July 23, 2016. M.W. and JENKINS signed the report under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

### August 8 and 9, 2016, Time and Attendance Fraud

71.    TAYLOR, E.H. and M.W. went on vacation in the Dominican Republic from August 5 to 9, 2016. TAYLOR, E.H. and M.W. were paid for their assigned shift, 8 a.m. to 4 p.m., on August 8 and 9, 2016.

### August 8, 2016, Robbery / Extortion of D.A.

72.    On or about August 8, 2016, Sergeant JENKINS and Detectives HERSL and J.C., acting in their capacity as police officers, conducted surveillance of D.A. leaving a storage facility. JENKINS, HERSL and J.C. pursued D.A. in their Baltimore City Police Department vehicle, and ultimately on foot, and arrested him. JENKINS, HERSL and J.C. then brought D.A. and his vehicle back to a location near the storage facility they had observed him leaving.

73.    HERSL and JENKINS searched the car D.A. had been driving and HERSL stole at least $7,000 from the vehicle.

74.    D.A. was taken from the scene in a police vehicle. JENKINS, HERSL, M.G. and J.R. then went to the storage facility where D.A. maintained a storage unit. M.G. and J.C. left the scene to prepare a search warrant for the unit, while JENKINS, HERSL and J.R. remained at the unit.

75.     HERSL then asked J.R. to leave the storage unit and go with him to a 7-Eleven. HERSL then took J.R. to the parking lot of Archbishop Curley High School where he gave him a portion of the money he had stolen from D.A.

76.     While HERSL, J.R., M.G. and J.C. were away from the unit, JENKINS entered it and stole 2 kilograms of cocaine that D.A. had been storing there.

### September 7, 2016, Robbery / Extortion of S.S.

77.     On or about September 7, 2016, Sergeant JENKINS and Detectives HERSL, TAYLOR, M.G., J.R. and M.W., acting in their capacity as police officers, stopped S.S. as he attempted to leave the parking lot of a storage facility in Baltimore City. TAYLOR told S.S. that they had a warrant to search his storage unit when, in fact, they did not. TAYLOR and J.R. then went into S.S.'s storage unit and took a sock containing cash from the unit and stole money from it. J.R. then gave the sock back to S.S. and told him to leave. S.S. was never charged with committing a crime.

78.     At the scene of the incident, inside a BPD vehicle, J.R. described to M.G. how he told JENKINS that he had only "taxed" S.S., a "little bit" referring to only stealing some of S.S.'s cash and that because they had not arrested S.S., "[h]e, [S.S.] won't say nothing" to other law enforcement authorities.   J.R. also told M.G., that he had to give "Wayne," referring to Wayne JENKINS, "a hundred dollars" of the cash stolen from S.S.

79.     To conceal the robbery and extortion, J.R. and TAYLOR did not prepare an Incident Report regarding the arrest. Further, J.R. and TAYLOR and M.W. did not submit to BPD the money stolen from S.S.

### Turning Off their Body Cameras

80.     On or about September 22, 2016, M.G. and J.R. were in M.G.'s BPD vehicle. They discussed an incident where JENKINS was fighting with a civilian and "hit the phone out

21

of her hand." M.G. told J.R., "I turned the camera off" referring to his body camera. J.R.

responded, "Oh yeah, fuck that shit" and then said "so basically you were never here."

### Planning Additional Robberies

81.    On September 22, 2016, M.G. and J.R. were in M.G.'s BPD vehicle. J.R. told

M.G., "He [JENKINS] told me about that, ah, he put me onto some big shit, yo, so I'm gonna

start lookin' into this dude, I was tellin' him whatchu you goin' doin' in pockets [referring to

robbing people of money they kept in their pockets], it's a fuckin' waste of time man . . . But

he's just like, yo, you know, um, I got big dude, I was tired of putting my name on it, I was just

goin' to give it to you motherfuckers." M.G. then asked if JENKINS provided the name of the

"big dude" that they could rob. J.R. responded,

> Naw, he said he's tired on puttin' his name on shit [referring to JENKINS
> putting his name on Statements of Probable Cause and other official BPD
> documents]. I was like, give me the motherfucker, I put my name on it . . .
> but then he was like, yo, this dude's good for at least two hundred [referring
> to $200,000], yo, we could get'em. I was like, ah right. He was like if we
> do it, you know, it'll be me and you, and I was like, ahright, and G [referring
> to M.G.]. He was like yeah. And then I was like, well, what's up with the
> other dudes, your boys, you know [referring to E.H., TAYLOR and M.W.].
> He was just like, nah, nah, they cool. I love them to death. Then he brought
> up the one where he, um, when they went outside and after everybody put
> up 20 dollars [meaning came away from the robbery with $20,000 each],
> you know what I'm talkin' about? Everybody was, he talked about the time
> where everybody had 20 g's [referring to $20 grand or $20,000].

M.G. responded, "you tellin' me he said that?" to which J.R. then replied,

> He was just like, man, honestly, I [UI] even got that much. I put all that
> time and work, they [referring to E.H., TAYLOR and M.W.] was just with
> me, and I was like, you right. So I said you right, cause G [M.G.] knows,
> when I get something,' or if my name on it, I'm getting' the more, cause
> I'm the one, he was like, yup, you put so much time in it. So actually I think
> it should have been 60 [$60,000], 10 [$10,000], 10 [$10,000] and 10
> [$10,000], that's what he said, or five [referring to $5,000 instead of
> $10,000] actually [referring to how the proceeds of a robbery should have
> been divided among JENKINS, and E.H., TAYLOR and M.W.]. I was like,
> I don't know about that. But, he was like, I'm tired of [UI]. I'm tired of

doin' all this work. I was like, yo, that makes sense, yo. But, I'm gonna see what's up with this dude and shit. I told him, I asked him, how long you think it take to get us, 'cause you know, I need 50 grand right now [referring to $50,000]. So he say, how long you think its gonna take. I was like a month, naw, we do it right, a couple of weeks. I was like, all right, I'll be hittin' him on them slash days you give us."

J.R. then told M.G., "I need a big one."

### October 3, 2016, Robbery / Extortion of G.H.

82.     On or about October 3, 2016, Sergeant JENKINS and Detectives TAYLOR, E.H., M.G. and M.W., acting in their capacity as police officers, engaged in a high-speed police chase of a vehicle driven by G.H. G.H. fled and threw over 9 ounces of cocaine out the window of his vehicle before crashing his vehicle near Mondawmin Mall.

83.     At the scene of the stop, JENKINS retrieved the cocaine, gave J.R. the cocaine, and told J.R. to sell the cocaine and give JENKINS the proceeds, which J.R. agreed to do.

### Alerting One Another to Investigations into their Criminal Conduct

84.     On October 5, 2016, M.G. and J.R. were in M.G.'s BPD vehicle. The two were discussing how JENKINS had received information that the GTTF was under investigation. M.G. said that "people" had been saying M.G. was the "biggest drug dealer in the department because he has money." M.G. described how JENKINS had told him that JENKINS had heard that M.G. was on a wiretap. M.G. said JENKINS told him it could be the "Feds" referring to federal law enforcement investigating their illegal activities, and that the investigation could have been on-going for five years, to which M.G. responded, "what case? It's no Pablo Escobar. It's POLICE." M.G. then said, "King and Murray, it was like a year or 9 months, that's it, Sylvester, it was months, Nigga Richburg, it was months," referring to police officers, King,

Murray, Sylvester and Richburg, who were prosecuted for robbing civilians and the amount of time that M.G. believed they were each under investigation.

18 U.S.C. § 1962(d)

## COUNT TWO
## (RICO)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs One through Eleven, Thirteen and Fifteen through Eighty Four of

Count One are hereby realleged and incorporated by reference herein as though fully set forth in

this Count of the Superseding Indictment.

### THE RACKETEERING VIOLATION

2.      From in or about 2011, until the date of this Superseding Indictment, in the

District of Maryland, Sergeant WAYNE EARL JENKINS and Detectives DANIEL THOMAS

HERSL and MARCUS ROOSEVELT TAYLOR. the defendants, together with E.H., M.G., J.R.,

M.W., and others known and unknown to the Grand Jury, being persons employed by and

associated with the Baltimore Police Department, an enterprise engaged in, and the activities of

which affected, interstate and foreign commerce, unlawfully and knowingly conducted and

participated, directly and indirectly, in the conduct of the affairs of that enterprise through a

pattern of racketeering activity, that is, through the commission of the following acts:

Racketeering Acts One through Twenty-Three below.

### THE PATTERN OF RACKETEERING ACTIVITY

3.      The pattern of racketeering activity as defined in Title 18, United States Code,

Sections 1961(1) and 1961(5), consisted of the following acts:

### Racketeering Act One
(May 11, 2011, Robbery / Extortion of W.B.)

4.      On or about May 11, 2011, then-Detective JENKINS and Detective M.G., acting in their capacity as police officers, attempted a traffic stop of W.B.  W.B. fled and eventually crashed his car and continued fleeing on foot.  M.G. pursued W.B. on foot while JENKINS stayed with W.B.'s vehicle.  M.G. ultimately caught W.B. and put him in handcuffs.

5.      W.B. had at least $1,800 in his car, which JENKINS stole.  JENKINS later shared the cash he stole with M.G.

6.      To conceal his illegal conduct, on May 11, 2011, JENKINS authored a false Incident Report that was filed with the BPD because a tow truck had to be called to tow W.B.'s crashed car.  The Incident Report failed to disclose that any money was taken from the vehicle.

7.      On or about May 11, 2011, in the District of Maryland, then-Detective JENKINS, the defendant, committed the following acts, any one of which alone constitutes the commission of Racketeering Act One:

> a.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, unlawfully conspired together with others known and unknown to the grand jury to wrongfully obtain money, property and anything of value from W.B. with W.B.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

> b.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully attempted to obtain money, property and anything of value from W.B. with W.B.'s consent under color and pretense of

office, under color of official right, and by wrongful use of actual and threatened

force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.  as an officer or employee of the State of Maryland, to wit, as a police officer and

employee of the BPD, wrongfully obtained money, property and anything of

value from W.B. with W.B.'s consent under color and pretense of office, under

color of official right, and by wrongful use of actual and threatened force and

violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together with others known and unknown to the grand jury

to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402;

and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Two**
(January 24, 2014, Robbery / Extortion of S.W.)

8.     On or about January 24, 2014, Detectives TAYLOR and M.W., and Sergeant I.,
acting in their capacity as police officers, arrested S.W. and executed a search warrant at his
residence.

9.     During the search of the residence, Detectives TAYLOR, M.W., and Sergeant I.
found over $10,000 and returned to BPD with the money.  At BPD, M.W. and TAYLOR stole a
portion of the money.

10.     To conceal their illegal conduct, on January 24, 2014, M.W. authored a false
Incident Report, which was approved by Sergeant I., and was filed with the BPD supporting the
arrest of S.W.  Above his signature, M.W. certified that, "I affirm and declare that the statements
above are true to the best of my knowledge."  The Incident Report falsely states that all property
recovered was recovered by TAYLOR and another Detective and was submitted to evidence
control, when in truth and fact, TAYLOR and M.W. stole at least $3,000 from S.W.

11.     On or about January 24, 2014, in the District of Maryland, Detective TAYLOR,
the defendant, committed the following acts, any one of which alone constitutes the commission
of Racketeering Act Two:

    a.   as an officer or employee of the State of Maryland, to wit, as a police officer and
         employee of the BPD, unlawfully conspired together with others known and
         unknown to the grand jury to wrongfully obtain money, property and anything of
         value from S.W. with S.W.'s consent under color and pretense of office, under
         color of official right, and by wrongful use of actual and threatened force and
         violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully attempted to obtain money, property and anything of value from S.W. with S.W.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully obtained money, property and anything of value from S.W. with S.W.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together with others known and unknown to the grand jury to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Three**
(November 5, 2014, Robbery / Extortion of J.G.)

12.     On or about November 5, 2014, Detective HERSL, Sergeant B and others, acting in their capacity as police officers, arrested J.G. At the time of his arrest, J.G. had approximately $6,000 on his person, which was a portion of proceeds paid out from a from a lead paint settlement. HERSL took the $6,000 from J.G. and only submitted $900 to BPD.

13.     To conceal his illegal conduct, on November 5, 2014, HERSL authored a false Incident Report that was filed with the BPD. Above his signature, HERSL certified that, "I affirm and declare that the statements above are true to the best of my knowledge." The Incident Report falsely states that $900 was recovered J.G. when, in truth and fact, $6,000 was taken from J.G. when he was arrested. The Report also falsely states that only $4,003 was found in the safe in J.G.'s bedroom when, in truth and fact, it contained $5,000.

14.     On or about November 5, 2014, in the District of Maryland, Detective HERSL, the defendant, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Three:

       a.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, unlawfully conspired together with others known and unknown to the grand jury to wrongfully obtain money, property and anything of value from J.G. with J.G.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

       b.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully attempted to obtain money, property and anything of value from J.G. with J.G.'s consent under color and pretense of office,

under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully obtained money, property and anything of value from J.G. with J.G.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together with others known and unknown to the grand jury to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

### Racketeering Act Four
(November 27, 2015, Robbery / Extortion of H.T.)

15.     On or about November 27, 2015, Detective HERSL, Sergeant B, and Detective 3, acting in their capacity as police officers, arrested H.T.

16.     Detective 3 searched H.T. and seized approximately $530 from him and a paystub. H.T. had earned the money from his job as an HVAC engineer.

17.     Detective 3 turned the money over to HERSL.

18.     HERSL only submitted $216 of the $530 that was taken from H.T. to the BPD.

19.     To conceal his illegal conduct, on November 27, 2015, HERSL authored a false Incident Report that was filed with the BPD supporting the arrest of H.T. Above his signature, HERSL certified that, "I affirm and declare that the statements above are true to the best of my knowledge." The Incident Report falsely states that HERSL recovered $216 from H.T. when in truth and fact, $530 was taken from H.T. when he was arrested.

20.     On or about November 27, 2015, in the District of Maryland, Detective HERSL, the defendant, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Four:

>    a.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, unlawfully conspired together with others known and unknown to the grand jury to wrongfully obtain money, property and anything of value from H.T.. with H.T.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

>    b.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully attempted to obtain money, property and

anything of value from H.T. with H.T.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully obtained money, property and anything of value from H.T. with H.T.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together with others known and unknown to the grand jury to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Five**
(November 28, 2015, Robbery / Extortion of A.S.)

21.    On or about November 28, 2015, Detective HERSL and Sergeant B, acting in their capacity as police officers, arrested A.S.

22.    HERSL seized $500 from A.S., which A.S. had earned in his job with a company that cleans office buildings overnight. A.S. is paid in cash. A.S. intended to use the money to pay his rent.

23.    HERSL only submitted $218 of the $500 that he took from A.S. to BPD.

24.    To conceal his illegal conduct, on November 28, 2015, HERSL authored a false Incident Report that was filed with the BPD supporting the arrest of A.S. Above his signature, HERSL certified that, "I affirm and declare that the statements above are true to the best of my knowledge." In that Incident Report, HERSL falsely stated that he recovered $218 from A.S., when in truth, HERSL had taken more than $500 from A.S.

25.    On or about November 28, 2015, in the District of Maryland, Detective HERSL, the defendant, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Five:

> a.   as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, unlawfully conspired together with others known and unknown to the grand jury to wrongfully obtain money, property and anything of value from A.S. with A.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

> b.   as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully attempted to obtain money, property and

34

anything of value from A.S. with A.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully obtained money, property and anything of value from A.S. with A.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together with others known and unknown to the grand jury to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Six**
(February 17, 2016, Robbery / Extortion of R.B.)

26.     On or about February 17, 2016, Sergeant JENKINS and Detective TAYLOR, the
defendants, acting in their capacity as police officers, committed the following acts, any one of
which alone constitutes the commission of Racketeering Act Six:

> a.   as officers or employees of the State of Maryland, to wit, as police officers and
>      employees of the BPD, unlawfully conspired together with others known and
>      unknown to the grand jury to wrongfully obtain money, property and anything of
>      value from R.B. with R.B.'s consent under color and pretense of office, under
>      color of official right, and by wrongful use of actual and threatened force and
>      violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;
>
> b.   as officers or employees of the State of Maryland, to wit, as police officers and
>      employees of the BPD, wrongfully attempted to obtain money, property and
>      anything of value from R.B. with R.B.'s consent under color and pretense of
>      office, under color of official right, and by wrongful use of actual and threatened
>      force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;
>
> c.   as officers or employees of the State of Maryland, to wit, as police officers and
>      employees of the BPD, wrongfully obtained money, property and anything of
>      value from R.B. with R.B.'s consent under color and pretense of office, under
>      color of official right, and by wrongful use of actual and threatened force and
>      violence in violation of MD. CODE ANN., Crim. L. § 3-702;
>
> d.   unlawfully conspired together with others known and unknown to the grand jury
>      to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e. attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f. committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

### Racketeering Act Seven
(March 9, 2016, Robbery / Extortion of M.MC.)

27.     On or about March 9, 2016, Sergeant JENKINS, the defendant, acting in his capacity as a police officer, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Seven:

          a.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, unlawfully conspired together with others known and unknown to the grand jury to wrongfully obtain money, property and anything of value from M.MC.s with M.MC.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

          b.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully attempted to obtain money, property and anything of value from M.MC. with M.MC.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

          c.  as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully obtained money, property and anything of value from M.MC. with M.MC.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

          d.  unlawfully conspired together to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.   attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.   committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

### Racketeering Act Eight
(March 22, 2016, Robbery / Extortion of O.S.)

28.    On or about March 22, 2016, in the District of Maryland, Sergeant JENKINS and Detective TAYLOR, the defendants, acting in their capacity as police officers, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Eight:

      a.    as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, unlawfully conspired together with others known and unknown to the grand jury to wrongfully obtain money, property and anything of value from O.S. with O.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and §3-702;

      b.    as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully attempted to obtain money, property and anything of value from O.S. with O.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

      c.    as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully obtained money, property and anything of value from O.S. with O.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

      d.    unlawfully conspired together with others known and unknown to the grand jury to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.   attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.   committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Nine**
(June 24, 2016, Robbery / Extortion of M.M.)

29.     On or about June 24, 2016, in the District of Maryland, Sergeant JENKINS, the

defendant, acting in his capacity as a police officer, committed the following acts, any one of

which alone constitutes the commission of Racketeering Act Nine:

      a.  as an officer or employee of the State of Maryland, to wit, as a police officer and

          employee of the BPD, unlawfully conspired together with others known and

          unknown to the grand jury to wrongfully obtain money, property and anything of

          value from M.M. with M.M.'s consent under color and pretense of office, under

          color of official right, and by wrongful use of actual and threatened force and

          violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

      b.  as an officer or employee of the State of Maryland, to wit, as a police officer and

          employee of the BPD, wrongfully attempted to obtain money, property and

          anything of value from M.M. with M.M.'s consent under color and pretense of

          office, under color of official right, and by wrongful use of actual and threatened

          force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

      c.  as an officer or employee of the State of Maryland, to wit, as a police officer and

          employee of the BPD, wrongfully obtained money, property and anything of

          value from M.M. with M.M.'s consent under color and pretense of office, under

          color of official right, and by wrongful use of actual and threatened force and

          violence in violation of MD. CODE ANN., Crim. L. § 3-702;

      d.  unlawfully conspired together with others known and unknown to the grand jury

          to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402
and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Ten**
(July 8, 2016, Robbery / Extortion of R.H. and N.H.)

30.    On or about July 8, 2016, in the District of Maryland, Sergeant JENKINS and Detective HERSL, the defendants, acting in their capacity as police officers, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Ten:

a.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, unlawfully conspired together with others known and unknown to the grand jury to wrongfully obtain money, property and anything of value from R.H. and N.H. with R.H.'s and N.H.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully attempted to obtain money, property and anything of value from R.H. and N.H. with R.H.'s and N.H.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.  as officers or employees of the State of Maryland, to wit, as police officers and employees of the BPD, wrongfully obtained money, property and anything of value from R.H. and N.H. with R.H.'s and N.H.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.  unlawfully conspired together with others known and unknown to the grand jury to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.  attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.  committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Eleven**
(August 8, 2016, Robbery / Extortion of D.A.)

31.     On or about August 8, 2016, Sergeant JENKINS and Detective HERSL, the
defendants, acting in their capacity as police officers, committed the following acts, any one of
which alone constitutes the commission of Racketeering Act Eleven:

a. as officers or employees of the State of Maryland, to wit, as police officers and
   employees of the BPD, unlawfully conspired together with others known and
   unknown to the grand jury to wrongfully obtain money, property and anything of
   value from D.A. with D.A.'s consent under color and pretense of office, under
   color of official right, and by wrongful use of actual and threatened force and
   violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b. as officers or employees of the State of Maryland, to wit, as police officers and
   employees of the BPD, wrongfully attempted to obtain money, property and
   anything of value from D.A. with D.A.'s consent under color and pretense of
   office, under color of official right, and by wrongful use of actual and threatened
   force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c. as officers or employees of the State of Maryland, to wit, as police officers and
   employees of the BPD, wrongfully obtained money, property and anything of
   value from D.A. with D.A.'s consent under color and pretense of office, under
   color of official right, and by wrongful use of actual and threatened force and
   violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d. unlawfully conspired together with others known and unknown to the grand jury
   to commit or attempt to commit robbery in violation of MD. CODE ANN., Crim. L.
   § 1-203 and § 3-402;

e.   attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.   committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

**Racketeering Act Twelve**
(September 7, 2016, Robbery / Extortion of S.S.)

32.     On or about September 7, 2016, in the District of Maryland, Detective TAYLOR, the defendant, acting in his capacity as a police officer, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Twelve:

a.   as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, unlawfully conspired together with others known and unknown to the grand jury to wrongfully obtain money, property and anything of value from S.S. with S.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

b.   as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully attempted to obtain money, property and anything of value from S.S. with S.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

c.   as an officer or employee of the State of Maryland, to wit, as a police officer and employee of the BPD, wrongfully obtained money, property and anything of value from S.S. with S.S.'s consent under color and pretense of office, under color of official right, and by wrongful use of actual and threatened force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

d.   unlawfully conspired together with others known and unknown to the grand jury to commit robbery in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-402;

e.   attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.   committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

## Racketeering Act Thirteen
(October 3, 2016, Robbery / Extortion of G.H.)

33.     On or about October 3, 2016, in the District of Maryland, Sergeant JENKINS, the

defendant, acting in his capacity as a police officer, committed the following acts, any one of

which alone constitutes the commission of Racketeering Act Thirteen:

   a.   as an officer or employee of the State of Maryland, to wit, as a police officer and

        employee of the BPD, unlawfully conspired together with others known and

        unknown to the grand jury to wrongfully obtain money, property and anything of

        value from G.H. with G.H.'s consent under color and pretense of office, under

        color of official right, and by wrongful use of actual and threatened force and

        violence in violation of MD. CODE ANN., Crim. L. § 1-203 and § 3-702;

   b.   as an officer or employee of the State of Maryland, to wit, as a police officer and

        employee of the BPD, wrongfully attempted to obtain money, property and

        anything of value from G.H. with G.H.'s consent under color and pretense of

        office, under color of official right, and by wrongful use of actual and threatened

        force and violence in violation of MD. CODE ANN., Crim. L. § 3-702;

   c.   as an officer or employee of the State of Maryland, to wit, as a police officer and

        employee of the BPD, wrongfully obtained money, property and anything of

        value from G.H. with G.H.'s consent under color and pretense of office, under

        color of official right, and by wrongful use of actual and threatened force and

        violence in violation of MD. CODE ANN., Crim. L. § 3-702;

   d.   unlawfully conspired together with others known and unknown to the grand jury

        with J.R. and M.G. to commit robbery in violation of MD. CODE ANN., Crim. L. §

        1-203 and § 3-402;

e.   attempted to commit robbery in violation of MD. CODE ANN., Crim. L. § 3-402; and

f.   committed robbery in violation of MD. CODE ANN., Crim. L. § 3-402.

## Racketeering Acts Fourteen through Twenty-Two
(Wire Fraud)

34.     As sworn officers with the BPD, the defendants were required to work their assigned shifts.  If a Defendant did not work his assigned shift because, for example, they were on vacation, they were required to notify the BPD and take vacation leave.

35.     In addition, as sworn officers with the BPD, the defendants were required to submit Individual Overtime Reports when they worked more hours than their assigned shift. Officers submitting Individual Overtime Reports were required to certify that they had worked their assigned shift and then were required to certify that they worked a specific amount of overtime and provide a justification for the overtime.  Officers submitting Individual Overtime Reports were required to sign the report and obtain the signature of their supervisor under the affirmation that, "We certify that the overtime hours reported herein are authorized, were in fact worked, and are correct."

36.     On or about the dates listed below in the District of Maryland and elsewhere, the defendants named below and others persons known and unknown to the Grand Jury devised and intended to devise a scheme and artifice to defraud the citizens of Maryland and the Baltimore Police Department and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to wit, the defendants submitted Individual Overtime Reports claiming to have worked hours when they, in fact, did not, and the defendants failed to work during their assigned shifts.   These Individual Overtime Reports and information concerning when the defendants worked their assigned shifts was transmitted via interstate electronic wires to ADP, the company that managed BPD's payroll, approximately every 14 days on the dates listed below.

37.     On or about the dates listed below, in the District of Maryland and elsewhere, the

defendants named below, for the purpose of executing the above-described scheme and artifice

to defraud, transmitted and caused to be transmitted by means of wire communication in

interstate commerce, the following writings, signals, and sounds, all in violation of Title 18,

United States Code, Section 1343 and Title 18, United States Code Section 2.

| Act No. | Defendant | Date | Wire Transmission |
|---------|-----------|------|-------------------|
| 14 | HERSL | 7/6/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 6/23/2016 to 7/6/2016. |
| 15 | HERSL | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |
| 16 | JENKINS | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |
| 17 | TAYLOR | 7/20/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/7/2016 to 7/20/2016. |
| 18 | HERSL | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 19 | JENKINS | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 20 | TAYLOR | 8/3/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 7/21/2016 to 8/03/2016. |
| 21 | HERSL | 8/17/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 8/04/2016 to 8/17/2016. |
| 22 | TAYLOR | 8/17/2016 | an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll, for the period 8/04/2016 to 8/17/2016. |

18 U.S.C. § 1962(c)

## COUNT THREE
### (Hobbs Act Robbery)

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs One through Six, Seven, Nine,Thirteen and Twenty-Seven through Thirty-Two of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Superseding Indictment.

2.     On or about March 22, 2016, in the District of Maryland, the defendants,

**WAYNE EARL JENKINS**
and
**MARCUS ROOSEVELT TAYLOR**

did unlawfully obstruct, delay and affect and attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by robbery and extortion as those terms are defined in 18 U.S.C. § 1951, in that the defendants knowingly and unlawfully took and obtained, and attempted to take and obtain, from a person and presence of such person, United States currency, that is approximately $200,000, against such person's will, by means of actual and threatened force, violence and fear of injury, immediate and future, and with their consent, induced by wrongful use of actual and threatened force, violence and fear, and under color of official right.

18 U.S.C. § 1951
18 U.S.C. § 2

## COUNT FOUR
### (Possession of a Firearm in Furtherance of a Crime of Violence)

The Grand Jury for the District of Maryland further charges that:

1.    Paragraphs One through Six, Seven, Nine, Thirteen and Twenty-Seven through

Thirty-Two of Count One are hereby realleged and incorporated by reference herein as though

fully set forth in this Count of the Superseding Indictment.

2.    On or about March 22, 2016, in the District of Maryland, the defendants,

**WAYNE EARL JENKINS**
and
**MARCUS ROOSEVELT TAYLOR**

the defendants herein, did knowingly, intentionally and unlawfully possess a firearm in

furtherance of a crime of violence for which they may be prosecuted in a court of the United

States, that is, a violation of 18 U.S.C. § 1951, as set forth in Count Three of this Superseding

Indictment, said Count incorporated by reference as if fully set forth herein.


18 U.S.C. § 924(c)
18 U.S.C. § 2

## COUNT FIVE
**(Hobbs Act Robbery)**

The Grand Jury for the District of Maryland further charges that:

    3.    Paragraphs One through Six, Seven, Eight, Thirteen and Thirty-Eight through Fifty of Count One are hereby realleged and incorporated by reference herein as though fully set forth in this Count of the Superseding Indictment.

    4.    On or about July 8, 2016, in the District of Maryland, the defendants,

**WAYNE EARL JENKINS**
and
**DANIEL THOMAS HERSL**

did unlawfully obstruct, delay and affect and attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by robbery and extortion as those terms are defined in 18 U.S.C. § 1951, in that the defendants knowingly and unlawfully took and obtained, and attempted to take and obtain, from a person and presence of such person, United States currency, that is approximately $20,000, against such person's will, by means of actual and threatened force, violence and fear of injury, immediate and future, and with their consent, induced by wrongful use of actual and threatened force, violence and fear, and under color of official right.

18 U.S.C. § 1951
18 U.S.C. § 2

## COUNT SIX
### (Possession of a Firearm in Furtherance of a Crime of Violence)

The Grand Jury for the District of Maryland further charges that:

1.        Paragraphs One through Six, Seven, Eight and Thirty-Eight through Fifty of

Count One are hereby realleged and incorporated by reference herein as though fully set forth in

this Count of the Superseding Indictment.

2.        On or about July 8, 2016, in the District of Maryland, the defendants,

**WAYNE EARL JENKINS**
and
**DANIEL THOMAS HERSL**

the defendants herein, did knowingly, intentionally and unlawfully possess a firearm in

furtherance of a crime of violence for which they may be prosecuted in a court of the United

States, that is, a violation of 18 U.S.C. § 1951, as set forth in Count Five of this Superseding

Indictment, said Count incorporated by reference as if fully set forth herein.

18 U.S.C. § 924(c)
18 U.S.C. § 2

**FORFEITURE**

RICO Forfeiture

1.      Pursuant to Title 18, United States Code, Section 1963, upon conviction of an

offense in violation of Title 18, United States Code, Section 1962, the defendants

**WAYNE EARL JENKINS,
DANIEL THOMAS HERSL, and
MARCUS ROOSEVELT TAYLOR**

shall forfeit to the United States of America:

      a.      any interest acquired or maintained in violation of section 1962;

      b.      any interest in, security of, claim against, or property or contractual right of any
kind affording a source of influence over, any enterprise which the defendants
established, operated, controlled, conducted, or participated in the conduct of, in
violation of section 1962; and

      c.      any property constituting, or derived from, any proceeds obtained, directly or
indirectly, from racketeering activity in violation of 1962.

2.      The interests of the defendants subject to forfeiture to the United States pursuant

to 18 U.S.C. § 1963(a)(1), (a)(2), and (a)(3), include, but are not limited to a sum of money

representing the amount of the gross proceeds received by the defendants derived from

racketeering activity as alleged in this Superseding Indictment, for which each of the defendants

are jointly and severally liable.

Substitute Assets

3.      If any of the property described above, as a result of any act or omission of the

defendants:

      a.   cannot be located upon the exercise of due diligence;
      b.   has been transferred or sold to, or deposited with, a third party;
      c.   has been placed beyond the jurisdiction of the court;
      d.   has been substantially diminished in value; or
      e.   has been commingled with other property that cannot be divided without
difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C.

§ 853(p) and 18 U.S.C. § 1963(m), as incorporated by 28 U.S.C. § 2461(c).


21 U.S.C. § 853
18 U.S.C. § 1963
28 U.S.C. § 2461(c)
18 U.S.C. § 924(d)

STEPHEN M. SCHENNING
ACTING UNITED STATES ATTORNEY


A TRUE BILL:

6/22/2017
Date

SIGNATURE REDACTED

Foreperson