**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA      :

         :

    v.                 :          **Case No. 1:17-cr-00106-GLR**

         :

WAYNE EARL JENKINS       :

**UNITED STATES' RESPONSE TO DEFENDANT'S *PRO SE* MOTION
TO SUSPEND AND DEFER RESTITUTION DUE TO
INCARCERATION AND FINANCIAL HARDSHIP**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully files this opposition to defendant Wayne Earl Jenkins' *pro*

*se* motion to suspend and defer his restitution obligations in case number 17-106 (ECF No. 931).

**RELEVANT BACKGROUND**

Defendant was a member of the Baltimore Police Department (BPD) who, between at least

2015 and 2017, abused his position to rob civilians he encountered in the course of his official

duties using BPD-issued firearms; steal drugs and money, including from homes; commit overtime

fraud; and author false incident reports, arrest reports, and warrant affidavits. Defendant, a

Sergeant and officer-in-charge of the BPD's Gun Trace Task Force (GTTF), recruited other

members of the GTTF into his scheme and led a conspiracy of at least six police officers.

On June 22, 2017, defendant and two co-defendants were charged with one count of

racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), one count of racketeering, in violation

of 18 U.S.C. § 1962(c), and additional crimes (ECF No. 137). Defendant was charged with two

counts of Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951 and 2, and two counts of possession

of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2. *Id.* at 54-57.[1]

On January 5, 2018, defendant pled guilty, pursuant to a Rule 11(c)(1)(C) agreement, to racketeering conspiracy, racketeering, and two counts of Hobbs Act robbery (ECF No. 254 at ¶ 1; ECF No. 452 at 3, 5-6). He agreed, pursuant to 18 U.S.C. §§ 3663, 3663A, 3563(b)(2), and 3583(d), to the entry of a Restitution Order for the full amount of the victims' losses (ECF No. 254 at ¶ 20). As to the restitution requirement, the plea agreement stated, "If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement." *Id.*

On June 7, 2018, defendant was sentenced to an aggregate term of 240 months' imprisonment to be followed by three years of post-release supervision. The Court deferred determination of the amount of restitution defendant would be required to pay (ECF No. 422 at 6; ECF No. 453 at 54).

Defendant appealed his convictions and sentence. The Fourth Circuit Court of Appeals dismissed defendant's appeal of his sentence and affirmed defendant's convictions. *United States v. Jenkins*, 745 Fed.Appx. 491 (4th Cir. 2018).

On May 28, 2019, the government filed a Motion for Restitution Orders as to defendant and his co-defendants (ECF No. 500). The government requested that defendant be ordered to pay $239,300 in restitution. *Id.* at 4-5. Defendant did not oppose the motion. *See* ECF No. 520 at 1.

On August 30, 2019, the Court granted the government's Motion for Restitution Orders and indicated it would issue amended judgment and commitment orders (ECF No. 520 at 1).

On August 25, 2021, the Court finalized the order of restitution as to defendant (ECF Nos.

---

[1] This indictment superseded an earlier indictment (ECF No. 1).

710, 711). The order and accompanying memorandum did not specify an amount of restitution that defendant must pay during his incarceration.

On October 13, 2021, the Court issued an Amended Judgment in a Criminal Case (ECF No. 719). Defendant's terms of imprisonment and post-release supervision were unchanged, but the amended judgment reflected the Court's order that defendant pay $239,300 in restitution, in addition to a $400 assessment. *Id.*[2]

On May 24, 2022, defendant filed, *pro se*, a Motion to Reopen and for Reconsideration of Restitution (ECF No. 751). On September 9, 2022, the government opposed the motion (ECF No. 757). On November 14, 2025, this Court denied the motion (ECF No. 939).

On October 10, 2025, defendant filed the instant motion, a *pro se* motion to suspend and defer restitution due to incarceration and financial hardship (ECF No. 931). He states that he currently "has extremely limited financial resources and earning capacity." *Id.* at 1. Specifically, he writes that "the standard inmate pay of $17.60 USD per month is insufficient to cover even the basic necessities within the facility, leaving no excess funds to apply toward restitution obligation." *Id.* Defendant further claims that over $80,000 in restitution payments that he made has "been unaccounted for by the Government." *Id.* He asserts that this "inaccurate accounting by the Government has caused irreparable harm and hardship" to him and his family because inmates who do not meet their restitution obligations lose privileges, benefits, and federal time credits, and because his wife filed for bankruptcy in June of 2025. *Id.* at 1-2. He asks the Court to suspend and defer his restitution obligations, pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. §§ 3663A-3664, until after he is released from prison. *Id.*

---

[2] The Court ordered defendant to pay $15,300 of the restitution on his own and to pay $224,000 in restitution jointly and severally with certain co-defendants (ECF No. 719 at 7).

Defendant is currently imprisoned in Federal Medical Center Lexington in Lexington, Kentucky. As of October 23, 2025, he owed $149,858.92 in restitution (Exh A: Payment History at 2). His projected release date is August 12, 2037 (Exh B: Sentence Data at 1).

## **ARGUMENT**

### **I.      Legal and Policy Principles**

The MVRA states, in 18 U.S.C. § 3663A(a)(1), that when sentencing a defendant convicted of certain offenses, including offenses in which an identifiable victim suffered a physical injury or pecuniary loss, the Court shall order, in addition to any other authorized penalty, that the defendant make restitution to the victim of the offense or any deceased victims' estates. 18 U.S.C. § 3664(k) indicates that if a defendant who has been ordered to pay restitution notifies the Court and the Attorney General of a "material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution," "the court may, on its own motion, or the motion of any party, . . . adjust the payment schedule, or require immediate payment in full, as the interests of justice require."

The Bureau of Prisons operates the Inmate Financial Responsibility Program (IFRP). Inmate Financial Responsibility Program: Procedures (IFRP Fed Reg), 89 Fed. Reg. 102022 (2024), *available at* https://www.federalregister.gov/documents/2024/12/17/2024-29692/inmate-financial-responsibility-program-procedures. "Inmate participation in the IFRP is non-compulsory." *Id.* "One purpose of the IFRP is to promote inmate financial understanding and self-regulation. To meet that goal, [Bureau of Prisons (BOP)] staff work with inmates to structure a reasonable payment plan that is attainable for the inmate." *Id.* 28 C.F.R. § 545.10 states:

> The Bureau of Prisons encourages each sentenced inmate to meet
> his or her legitimate financial obligations. As part of the initial

classification process, staff will assist the inmate in developing a financial plan for meeting those obligations, and at subsequent program reviews, staff shall consider the inmate's efforts to fulfill those obligations as indicative of that individual's acceptance and demonstrated level of responsibility.

28 C.F.R. § 545.11(b) explains:

The inmate is responsible for making satisfactory progress in meeting his/her financial responsibility plan and for providing documentation of these payments to unit staff. Payments may be made from institution resources or non-institution (community) resources. In developing an inmate's financial plan, the unit team shall first subtract from the trust fund account the inmate's minimum payment schedule for UNICOR or non-UNICOR work assignments, set forth in paragraphs (b)(1) and (b)(2) of [28 C.F.R. § 545.11]. The unit team shall then exclude from its assessment $75.00 a month deposited into the inmate's trust fund account. This $75.00 is excluded to allow the inmate the opportunity to better maintain telephone communication under the Inmate Telephone System (ITS).

"As the IFRP is currently operated, [BOP] staff review and reassess each inmate's financial plan and IFRP payments during the inmate's regularly scheduled program review meeting; these meetings generally occur every 180 days" (IFRP Fed Reg). During that review, BOP staff "first review the total funds deposited into the inmate's commissary account over the previous six-month period from any source." *Id.* Funds in an inmate's commissary account can come from various sources, including, among other things, pay from work assignments, contributions from family or friends, and tax refunds. *Id.* "All money earned by the inmate from the [BOP] is automatically deposited into the inmate's commissary account." *Id.*

The next step in the review is for BOP staff "to determine whether future payments under the IFRP plan should be adjusted based on the inmate's financial activity over the previous six-month period under review" (IFRP Fed Reg). BOP staff "subtract the total amount of any payments an inmate has made during the previous six-month period under the IFRP plan . . . from the amount

5

deposited into the account over that same time period." *Id.* BOP staff always exclude from their assessment $75.00 a month ($450 per six-month period), which is reserved for the inmate's telephone communications. *Id.* "Then, based on the foregoing information, staff estimate the amount the inmate is likely to have remaining at the end of that six-month period" and, accordingly, "determine whether to adjust the inmate's financial plan and IFRP payments." *Id.* "The Unit Manager is the determining authority when it comes to determining whether an inmate's IFRP payments are commensurate with his/her ability to pay." Federal Bureau of Prisons, Program Statement P5380.08, *Inmate Financial Responsibility Program* (Aug. 15, 2005) (BOP IFRP Prog Stmt) at 8, *available at* https://www.bop.gov/policy/progstat/5380_008.pdf. "This decision is solely at the discretion of the Unit Manager and is to be decided on a case-by-case basis." *Id.*

If an inmate refuses to participate in the IFRP or to comply with the provisions of his financial plan, there can be a number of repercussions. *See* 28 C.F.R. § 545.11(d). Those potential consequences include, but are not limited to, ineligibility for placement in UNICOR, imposition of a monthly commissary spending limitation that is more stringent than the normal limitation, and ineligibility for incentives for participation in a residential drug treatment program. 28 C.F.R. §§ 545.11(d)(5), (6), (11). On November 10, 2025, a Senior Attorney at the BOP's Lexington Consolidated Legal Center advised undersigned counsel that inmates eligible to earn First Step Act (FSA) time credits, like defendant, who refuse to participate in the IFRP will not earn FSA time credits while they are in refusal status. The BOP Senior Attorney further advised undersigned counsel that refusal to participate in the IFRP can affect whether an inmate receives priority housing (*i.e.*, dormitory, double bunks) in institutions that have priority housing and can affect the inmate's custody classification points, which can impact home-confinement or halfway-house placement.

An inmate may be temporarily exempted from participation in the IFRP if he "is unable to participate adequately toward satisfaction of the obligation, ordinarily because of medical or psychological restrictions which prevent the inmate from working." BOP IFRP Prog Stmt at 15.

## II.  Defendant's Financial Situation and Restitution Progress

Defendant has paid the above-referenced $400 assessment and an additional $200 assessment (Exh C: Payment History Obligation 1; Exh D: Payment History Obligation 2). Of that $600, $450 came from "outside" sources (Exh C at 1; Exh D at 1). Defendant paid the remaining $150 toward those obligations in 2019 and 2020 (Exh C at 1).

Defendant has never refused to participate in the IFRP. *See* Exh E: Contract History. Between February 22, 2018, and July 26, 2018, he was in transit between prisons and therefore did not make restitution or assessment payments during that time. Following that transfer, he made payments toward his assessment obligations until he again transferred prisons in 2020. *Id.* Between December 28, 2020, and January 14, 2021, defendant did not participate in the IFRP as a result of the transfer process. *Id.* Lack of participation based on a transfer does not result in a penalty to the prisoner.

On March 31, 2022, defendant made restitution payments totaling $82,661.49, entirely from outside sources (Exh A at 7; Exh F: Payment History Obligation 3).

Between April 5, 2021, and October 28, 2024, defendant's financial obligations were erroneously marked as "complete" in defendant's BOP records (Exh E at 1; *see also* Exh G: 2/15/24 Program Review at 2, which describes defendant's financial responsibilities as "completed" and listing, as his financial obligations, only his two assessments and not his

restitution obligation).[3] The BOP caught this error in approximately December of 2024 and set up a financial payment schedule. *See* Exh H: 1/20/25 Program Review at 2; Exh E at 1. Defendant agreed to pay $50 per month toward his restitution obligation (Exh H at 2). He made his first and only $50 payment toward restitution on April 10, 2025 (Exh I: 6/12/25 Program Review at 3; Exh F at 1). Defendant's June 12, 2025, Program Review indicated that in the six months from December 12, 2024, through June 12, 2025, he received $4,355.25 in deposits to his inmate trust fund account (Exh I at 4).

In September of 2025, defendant did not make a restitution payment (Exh J: FMC Lexington FRP Payment History at 1). That month, he agreed to a new financial plan under which he would pay $25 per quarter toward his restitution obligation, an 83% decrease from his prior financial plan (Exh K: Inmate Financial Plan).

The government has attached a document showing defendant's work history while incarcerated (Exh L: Work History). Defendant has held numerous jobs during his incarceration, including as an orderly, in recreation, and on the snow crew. *Id.* Currently, he works as a suicide watch companion and an inmate companion. *Id.* at 1.

Defendant's Inmate Statement shows his history of earnings for work while incarcerated, his receipt of money from outside sources, and purchases and withdrawals he has made while in custody (Exh M: Inmate Statement from 10/1/23-11/6/25).[4] Between October 1, 2023, and

---

[3] Undersigned counsel was informed by a Senior Attorney at the BOP's Lexington Consolidated Legal Center that this "complete" notation was erroneous.

[4] The Inmate Statement uses a number of abbreviations and terms to describe types of transactions. A "TRUL Withdrawal" is a withdrawal of money to make payments through an inmate's TRULINCS account for telephone calls and e-mail communications. "Lockbox – CD" refers to money sent from an outside source (i.e., family and friends) to the inmate via Western Union or Money Gram. "BP 199 Request" refers to an inmate's request to withdraw money from his account to send to someone outside prison or to pay for things located outside of the prison.

November 6, 2025, defendant received over $20,000 in deposits from outside sources. *Id.* In early December 2024 -- the same month that the BOP caught its erroneous notation that defendant had completed paying his restitution obligations -- defendant had over $9,000 in his inmate account. *Id.* at 8. On December 16, 2024, he sent a $9,000 payment to someone outside the prison. *Id.* at 9 (listing payment for "Support" in the amount of $9,000).[5] In early April 2025, shortly before defendant's first $50 restitution payment was due, defendant had over $2,500 in his inmate account. *Id.* at 12. On April 1, 2025, nine days before he made that restitution payment, he requested to send $2,500 from his inmate account to someone outside the prison. *Id.* That payment, labeled by defendant as "Support," left defendant's account on April 14, 2025. *Id.*

Between October 1, 2023, and November 6, 2025, defendant frequently had balances in his inmate account of hundreds or thousands of dollars (Exh M). In addition to the above-described transactions, he made at least 27 purchases of over $100 each and many smaller purchases. *Id.* As of November 6, 2025, he had a balance of $103.41 in his account.

Because defendant has never been in "refuse" status in terms of participating in the IFRP (*see* Exh E), he has not lost any privileges or benefits for failure to make restitution payments.[6]

---

[5] The transaction type of "Support" reflected in the Inmate Statement was chosen by defendant when he sent the $9,000 payment.

[6] While defendant has lost some Good Credit Time (GCT) during his incarceration, those punishments were the result of his commission of disciplinary infractions, not a refusal to make his restitution payments (Exh N: Discipline Data at 1 (showing that defendant lost 27 days of GCT in 2022 as a result of a fighting infraction and 27 days of GCT in 2018 because of a fighting infraction); Exh O: Good Time Data at 1 (showing that defendant's only losses of GCT were for those two infractions)).

As of October 29, 2025, defendant had earned 378 days of GCT and was projected to earn a total of 1,296 days of GCT during his incarceration (Exh B at 3).

**III.    Analysis**

In the instant motion, defendant asks the Court to suspend and defer his restitution obligation because, he claims, the money he earns from his job in prison leaves "no excess funds to apply" toward his restitution requirement (ECF No. 931 at 1). Defendant provided no documents relating to his inmate account with his motion, and he did not give any details regarding the deposits into or expenditures from his account. As described above, a review of defendant's Inmate Statement, which is attached to this response as Exhibit M, reveals that defendant plainly is able to pay $25 per quarter toward his restitution obligation. After all, in addition to earning money through his jobs in prison, defendant receives substantial deposits in his account. His claim that he can barely afford basic necessities is belied by the record of the thousands of dollars he has spent in prison and sent to non-incarcerated people. Defendant, thus, has not demonstrated that he has an inability to make restitution payments. Nor has he shown a material change in his economic circumstances that impacts his ability to pay restitution.

Defendant further claims that as of August 26, 2025, check payments totaling $82,661.49 made toward his restitution were "unaccounted for" (ECF No. 931 at 1). As described above, and as shown in the attached exhibits, however, defendant has been credited with paying $82,661.49 on March 31, 2022.

Finally, defendant alleges that the government's purportedly "inaccurate accounting" has harmed him because an inmate in non-compliance with his IFRP plan may lose certain privileges and benefits (ECF No. 931 at 1-2). Defendant, however, has not demonstrated that the government inaccurately accounted for his restitution payments. Moreover, as described above and as shown

in the attached exhibits, defendant has never been penalized for failing to meet his restitution obligations.[7]

In sum, defendant has not demonstrated a basis for this Court to defer or suspend his restitution obligations or to otherwise adjust his payment schedule.

---

[7] To the extent that defendant argues that he and his family have been harmed because defendant's wife filed for bankruptcy (ECF No. 931 at 1), defendant has not alleged that that bankruptcy filing was due to defendant's failure to comply with his IFRP plan or that his family's financial situation was impacted in any way by defendant's payments toward his assessment or restitution obligations made from his prison earnings. Further, he has not shown, pursuant to 18 U.S.C. § 3664(k), that the bankruptcy constitutes a material change in his economic circumstances that affects his ability to pay restitution.

## **CONCLUSION**

For all the reasons stated herein, and based on the entire record, this Court should summarily deny defendant's motion.


Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney
   for the District of Columbia

KACIE M. WESTON
Chief, Special Proceedings Division
United States Attorney's Office
   for the District of Columbia
MD Bar

THOMAS STUTSMAN
Deputy Chief, Special Proceedings Division
United States Attorney's Office
   for the District of Columbia
MN Bar


 _/s/ Tracy Suhr_____
TRACY SUHR
Special Assistant United States Attorney
   Acting Under Authority Conferred by 28 U.S.C. § 515
Special Proceedings Division
United States Attorney's Office
   for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-6898
Tracy.Suhr@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, this 19th day of November 2025, I caused a copy of the foregoing and the attached exhibits to be served via U.S. mail, postage prepaid, on:

Wayne Earl Jenkins
Fed. Reg. No. 62928-037
FMC Lexington
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512

_/s/ Tracy Suhr_____
TRACY SUHR
Special Assistant United States Attorney